**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Getten Credit Company, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FAIR ISAAC CORPORATION, <br><br> Defendant. | Civil Action No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Getten Credit Company brings this class action complaint against Defendant Fair Isaac Corporation ("Fair Isaac"), on behalf of itself and all entities who paid for a FICO Score from Defendant and/or a credit bureau in the U.S. from at least as early as January 1, 2006 until the present (the "Class Period") for commercial use. Plaintiff brings this action under the Sherman Act and various state antitrust laws against Fair Isaac for injunctive relief and damages, and demands a trial by jury. Based upon personal knowledge, information and belief, investigation by counsel, proceedings and admissions made in *Fair Isaac Corp. v. Trans Union LLC*, 17-cv-08318 (N.D. Ill.), and related ongoing federal government investigations, Plaintiff alleges:

## NATURE OF ACTION

1.      Plaintiff is informed and believes, and thereon alleges, that Fair Isaac has monopolized, conspired to monopolize, and unreasonably restrained trade in the business-to-business market for supplying credit scores to lenders, financial institutions, and other businesses for risk management decisions ( the "B2B Credit Score Market").

2.      Fair Isaac's ubiquitous credit scoring model known as the FICO Score is what most businesses use to size up the creditworthiness of consumers. Fair Isaac's FICO Scores have dominated the market for almost three decades. Defendant has, as its executives have touted, been able to maintain a 90-plus percent market share in the B2B Credit Score Market for at least 13 years. Defendant achieved this by abusing its illegal monopoly and engaging in anticompetitive conduct including, but not limited to, exclusionary agreements with credit bureaus and other distributors of Defendant's FICO Scores and false and misleading media campaigns against its competitors.

3.      As a result of its illegal actions, Defendant's unlawful monopoly share has suppressed competition, stymied innovation, limited access to credit for millions of Americans, and increased the prices of FICO Scores to the detriment of Plaintiff and Class members.

4.      On March 15, 2020, Fair Isaac disclosed in a press release that the Antitrust Division of the United States Department of Justice had opened an investigation based at least in part on the exclusionary conduct alleged herein.

## JURISDICTION AND VENUE

5.      This action arises under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and section 4 of the Clayton Act (15 U.S.C. § 15(a)) and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class resulting from Fair Isaac's anticompetitive conduct. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

6.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, the Defendant resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged

2

activity affected interstate trade and commerce discussed below has been carried out in this District.

7.      During the Class Period, Defendant's conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

8.      During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the U.S. mail, to effectuate its illegal scheme.

9.      This Court has personal jurisdiction over Defendant because Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. The unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States.

10.     Plaintiff purchased at least one FICO Score from Fair Isaac and TransUnion, which is headquartered in this District. Defendant employs persons who work in its credit score business in this District. Defendant is also registered to do business in Illinois.

11.     Defendant selected this District to institute Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

**PARTIES**

**A.  Plaintiff**

12.     Plaintiff Getten Credit Company is a corporation with its principal place of business in Mendota, Minnesota. Plaintiff is a small, family-owned independent finance company that specializes in helping consumers with various financial needs including debt consolidation, purchasing vehicles, and rebuilding credit.

13. During the Class Period, Plaintiff paid for FICO Scores from Defendant and TransUnion.

**B. Defendant**

14. Defendant Fair Isaac Corporation is a publicly traded Delaware corporation, with its principal place of business in San Jose, California. Defendant is a leading data analytics company focused on credit scoring services. Its FICO Score has become the standard measure of consumer credit risk in the United States.

## FACTUAL ALLEGATIONS

15. As described in greater detail below, Plaintiff has been harmed in several respects because Fair Isaac and credit bureaus have entered into anticompetitive agreements with the goal of eliminating all competition in the B2B Credit Score Market. Defendant's conspiracy has permitted it to charge supracompetitive prices to credit bureaus and companies that rely on credit scores, such as Plaintiff, and tilt the table in favor of Defendant's own credit scoring products that they develop.

16. In support of Plaintiff's claims that Defendant have engaged in illegal, anticompetitive conduct, Plaintiff sets forth below the relevant product market—the B2B Credit Market—involved in Defendant's conspiracy; the details of Defendant's anticompetitive conduct and the harm to competition caused by Defendant's anticompetitive conduct; and that there is no pro-competitive justification for Defendant's actions.

**I. The B2B Credit Market Overview**

**A. Credit Scores, Reports, and Credit Bureaus**

17. Credit scores are designed to assess credit risk and are the most widely used indicators of consumers' creditworthiness in the United States. Lenders, financial institutions,

4

and other businesses rely on credit scores to decide whether and on what terms to extend credit to consumers. Consumers, in contrast, rely on credit scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

18.     Credit reports and credit scores are different; credit scores can be sold together with credit reports or independently. A credit report is a statement with detailed information about a consumer's credit activity and current credit situation, and might, for example, include information about a consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries. Credit scoring systems apply an algorithm to the credit report to produce a credit score. These credit scores are usually three digits and accompanied by "reason codes," which inform the lender of significant contributions to the reduction of a consumer's credit score.

19.     Credit reporting agencies ("credit bureaus")—which include TransUnion, Equifax, and Experian—collect and supply aggregated consumer credit data in the form of consumer reports. The credit bureaus maintain sophisticated databases of consumer credit data to provide comprehensive information on consumers' financial behavior by continuously gathering credit and financial data about consumers from creditors, government entities, public records, collection agencies, and other third parties. This information is then compiled into a "credit file." The credit bureaus sell credit reports, which include information from a consumer's credit file, to businesses and consumers.

### B.  The B2B Credit Score Market is a Distinct Product Market

20.     There are two distinct markets for credit scores in the United States: (1) the B2B Credit Score Market and (2) the B2C ("business-to-consumer") Credit Score Market. B2B and

5

B2C credit scores are priced, purchased, and used very differently and serve very different purposes.

21.     Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B credit scores in order to make risk management decisions ("B2B Purchasers"). Lenders, financial institutions, and other businesses that purchase credit reports from Defendant and/or the credit bureaus generally purchase credit scores in order to determine the credit-worthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

22.     Customers in the B2C Credit Score Market, in contrast, purchase credit scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. American consumers often use credit monitoring or identity protection accounts from, for example, Capital One, Credit Karma, and LifeLock which often include access to the consumer's own credit score.

23.     The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use credit scores to assess creditworthiness and make decisions about whether and on what terms to extend credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for credit scores.

24.     The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market. Fair Isaac

also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit Score Market.

25. The B2B Credit Score Market is characterized by significant barriers to entry. B2B Purchasers encounter significant "switching costs" if they adopt a new credit score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of credit score (unlike consumers in the B2C Credit Score Market).

26. Network effects also characterize the B2B Credit Score Market. As more banks and consumers use a particular type of credit score, that credit score becomes a de facto "industry standard."

**II. Fair Isaac Has a Monopoly in the B2B Credit Score Market**

27. Fair Isaac has maintained a monopoly over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of its FICO product line, which includes many different types of FICO Scores.

28. Introduced in the 1980s, Fair Isaac's "FICO Classic" credit scores are the best known and most widely used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each credit bureau's data and generates a score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

29. Fair Isaac advertises its monopoly in the B2B Credit Score Market on its website: 90% of all lending decisions in the United States rely on FICO Scores, 27.4 million FICO Scores are sold every day, 10 billion FICO Scores are sold each year, and 100 billion FICO Scores sold to date—making FICO the most used credit score in the world.

30. Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

31. Fair Isaac representatives have described Fair Isaac's FICO score as "the 800-pound gorilla" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share. For example, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."

32. Fair Isaac representatives have also recognized that FICO scores have benefited from the network effects created by the widespread use of FICO scores in many industries. For example, in November 2011, then-CEO of Fair Isaac Mark Greene explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "having everybody . . . standardize on a FICO Score, that's magic."

33. Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices. Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."

### III. Fair Isaac's Anticompetitive Conduct

#### A. Fair Isaac Has Contracted with Credit Bureaus as Agents and Co-Conspirators in its Scheme to Monopolize

34.     With its dominant position in the B2B Credit Score Market, Fair Isaac uses and enlists the assistance of the credit bureaus (TransUnion, Equifax, and Experian) to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B Purchasers like Plaintiff is often dependent on B2B Purchasers' relationships with credit bureaus, who help to facilitate the sale of Defendant's FICO Scores.

35.     When a B2B Purchaser requires a credit score, it purchases the report from a credit bureau, and the credit score jointly from the credit bureau and Fair Isaac. Although the payment may at times occur in a single transaction, the practical reality, as expressly set forth in contracts governing the sale of credit scores to B2B Purchasers, is that both the credit bureau and Fair Isaac act as the provider of the FICO Score.

36.     B2B Purchasers' contracts for FICO Scores are often known as Credit Scoring Services Agreements ("CSSAs"). CSSAs provide for the method of payment and fee model for the delivery of credit score services and establish the relationship between Fair Isaac and the B2B Purchasers.

37.     For example, the CSSA between Plaintiff, its credit bureau TransUnion, and Fair Isaac makes clear that the "the Fair Isaac Scores are the property of Fair Isaac and are proprietary to Fair Isaac" and that Fair Isaac grants to Plaintiff a "limited license to use, internally, the Fair Isaac Scores solely for the particular purpose . . . for which the Fair Isaac Scores were obtained."

38.     In Plaintiff's and Class Members' procurement of FICO Scores, the credit bureaus act as co-conspirators and agents of Fair Isaac.

### B. Fair Isaac Has Leveraged its Monopoly Power to Eliminate Competition from VantageScore

39.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore. The anticompetitive agreements that Defendant and the credit bureaus entered into include contract terms that restrict the credit bureaus' ability to compete and sell VantageScore, penalty pricing and bundling to foreclosure competition from competitors, and permits Fair Isaac to extract monopoly prices.

40.     Fair Isaac has been explicit that this is its goal. In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has enlisted its competitors (the credit bureaus, which jointly own and control VantageScore) to agree to anticompetitive contracts that: prevent them from developing or selling alternative credit scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate prices from FICO; and create a pricing scheme effectively foreclosing B2B Purchasers from choosing to use FICO Scores in their lending decisions at the same time as providing customers with a competing credit score, including VantageScore. At the same time, Fair Isaac has waged a media campaign against VantageScore and made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability. By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of Americans.

41.     In March 2006, VantageScore introduced the VantageScore credit score and credit scoring system. VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

42.     From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems. Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years. It also reached more consumers by using utility and telecommunications payment histories when reported to the credit bureaus.

43.     Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems. Fair Isaac's outdated FICO Classic credit scoring systems—which are still used by many lenders—exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults—some 65 million people—do not have a traditional FICO score. VantageScore is capable of reducing the number of adults without a credit score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

44.     Without a credit score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a credit score can also have drastic effects outside of the credit market. For example, credit scores are increasingly used by landlords.

45.     Those excluded by Fair Isaac's traditional FICO scoring systems—who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing—include disproportionate numbers of low-income and minority

consumers, many of whom VantageScore has calculated scores for, including 2.7 million that should be considered "prime borrowers."

46.     Despite the advantages of using VantageScore, Fair Isaac continues to have a monopoly in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our scores business" because "FICO scores are very much part of the fabric of the banking industry" and "really deeply imbedded."

### C. Fair Isaac's Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems

47.     In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement. With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract rather than renew their existing contracts. Fair Isaac represented to TransUnion that Experian and Equifax had already agreed to materially similar new contracts with Fair Isaac. If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores. On information and belief, TransUnion, Equifax, and Experian all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

48.     Fair Isaac has imposed a similar or identical "No Equivalent Products" clause on each of the credit bureaus. By imposing a "No Equivalent Products" term, Fair Isaac has sought to block the credit bureaus from offering alternative credit score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore

alongside or interchangeably with FICO Scores. The credit bureaus have agreed to and acquiesced in these anticompetitive agreements, terms, and resulting anticompetitive effects.

49.     The "No Equivalent Products" clause provides that a credit bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. It also prohibits a credit bureau from distributing any competing analytic (i.e., credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and the clause expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

50.     For example, if a competing credit score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the "No Equivalent Products" clause prevents a credit bureau from distributing the competing product. Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits a credit bureau from distributing the product.

51.     The "No Equivalent Products" clause effectively prevents a credit bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's credit scores that would (i) be compatible with many B2B Purchasers' systems, models, and processes; and (ii) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-

13

score relationship (i.e., each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

52.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac but reflect well-established industry best practices for lending.

### D.    Agreements Between Fair Isaac and Credit Bureaus Include Provisions Foreclosing Competition Including Penalty Pricing and Bundling

53.     Fair Isaac's contracts with each credit bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category. Through the "Pre-Qualification" royalty category, Fair Isaac has effectively foreclosed lenders from the ability to purchase and use a FICO score in their lending decision while providing a consumer with a competing Credit Score, which drives lenders to buy exclusively Fair Isaac's FICO Scores and not to purchase competing Credit Scores. As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks to provide to consumers.

54.     In 2015, Fair Isaac unilaterally imposed, and the credit bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: (1) lenders that use FICO Scores for

"Pre- Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing Credit Scores or credit data to consumers "in connection" with the "Pre-Qualification." Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (e.g., a credit card or loan) and, at the same time, receive their personal Credit Score. The offer of a free Credit Score to a consumer can entice consumers to apply for credit opportunities.

55.     The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers. If a lender purchases a FICO score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other Credit Score (such as a VantageScore) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is higher – a penalty rate.

56.     The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

57.     There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the credit bureaus when the lender also purchases any other Credit Score to disclose to consumers. The transparent purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores

15

and make it cost- prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score for disclosure to consumers. This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

58.     Fair Isaac's "Level Playing Field," requires that the prices that are made available to one credit bureau be made available to the other credit bureaus. Taken together, the "Dynamic Royalty Schedule" and the "Level Playing Field" clauses enable Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

59.     Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the credit bureaus to extract monopoly prices from B2B Purchasers. These provisions disincentivize a credit bureau from negotiating for a lower price because it knows that even if it succeeds, it will not gain a competitive advantage over the other credit bureaus.

**E.   Fair Isaac Has Waged a Media Campaign to Discredit VantageScore's Reliability Among B2B Purchasers**

60.     Despite having successfully induced the credit bureaus to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac has gone even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

61.     On December 12, 2017, Fair Isaac took out a full-page advertisement in The Wall Street Journal addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for Credit Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

62.     The Wall Street Journal advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

63.     Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

64.     Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This

17

statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

65.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

66.     Fair Isaac's campaign against VantageScore is not new. In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the credit bureaus and VantageScore in the United States District Court for the District of Minnesota. See Fair Isaac Corporation v. Equifax Inc., No. 06-cv-04112 (D. Minn.). This was the monopolist's first attempt to kill the nascent competitor. Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore: it requested that the "Defendants be ordered to dissolve VantageScore."

67.     All of Fair Isaac's claims failed; in fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The credit bureaus and VantageScore

18

counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

68.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

## II. Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition

69.     Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including that which has been taken in concert with the credit bureaus, has foreclosed competition in the B2B Credit Score Market by foreclosing opportunities for the credit bureaus to sell VantageScore or any other competitive products. The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

70.     Fair Isaac's conduct, in concert with the credit bureaus, including by the contracts entered into by the credit bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the credit bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

71.     Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO score. For

example, thebalance.com – a website devoted to personal finance issues – posted in February 2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."

## FRAUDULENT CONCEALMENT AND TOLLING

72. A cause of action accrued for Plaintiff each time Fair Isaac and/or a credit bureau sold a B2B Credit Score to plaintiff at a supracompetitive price made possible by their anticompetitive conduct. Each such sale constituted an overt act in furtherance of their anticompetitive scheme. Accordingly, Plaintiff is entitled to recover all damages on all sales that Fair Isaac and/or its co-conspirators made to Plaintiff at supracompetitive prices within four years of the filing of this action.

73. Due to Fair Isaac's concealment of its unlawful conduct, however, Plaintiff and members of the Class are entitled to recover damages reaching back even beyond the four-year statute of limitations period. Fair Isaac's violations were not reasonably discoverable until February 12, 2018, when TransUnion disclosed the misconduct in a suit against Fair Isaac. Plaintiff and members of the Class had no knowledge of the unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this action.

74. That is true, at least in part, because the nature of the scheme was self-concealing and because Fair Isaac employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, its scheme.

75. Because the scheme was both self-concealing and affirmatively concealed by Fair Isaac, Plaintiff and members of the Class had no knowledge of the scheme more than four years

before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate.

76.     Plaintiff and members of the Class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiff and members of the Class would not have uncovered those facts more than four years before the filing of this complaint.

77.     As a result of Fair Isaac's fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and Class members' claims have been tolled.

78.     The federal government's antitrust investigation of Fair Isaac's unlawful conduct also tolls any federal statute of limitations pursuant to 15 U.S.C. § 16.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b) on behalf of:

> All entities who paid for a FICO Score from Defendant and/or a credit bureau in the United States during the Class Period for commercial use.

80.     Specifically excluded from the Class are the Defendant; the officers, directors or employees of the Defendant; any entity in which the Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of the Defendant. Also excluded from the Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action. Also expressly excluded are any natural persons that purchased their own credit score solely via myFico.com, the credit bureaus, or other entities for their personal use.

81.     Members of the Class are readily identifiable from Defendant's records.

82.     Members of the Class are so numerous that individual joinder of all the members is impracticable. Although the precise number and identification of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery of Defendant.

83.     This action is brought and may properly be maintained as a class action pursuant to the provision of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1)-(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Common questions of fact and law exist as to all Class members which predominate over all questions affecting only individual Class members.  These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include the following:

    a.   whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of certain state antitrust laws;

    b.   whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

    c.   the duration of the alleged unlawful conduct;

    d.   injury suffered by Plaintiff and members of the Class;

    e.   damages suffered by Plaintiff and members of the Class;

    f.   whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief; and

    g.   the appropriate class-wide measure of damages.

84. These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual Class members.

85. Plaintiff's claims are typical of the claims of the Class members. Plaintiff and other Class members must prove the same facts in order to establish the same claims, described herein, which similarly apply to all Class members.

86. Plaintiff is an adequate representative of the Class because it is a member of the Class and its interests do not conflict with the interests of the Class members it seeks to represent. Plaintiff has retained counsel competent and experienced in the prosecution of complex class action litigation, and together Plaintiff and its counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiff and its counsel.

87. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts, in which individual litigation of hundreds of cases would proceed. Individual litigation presents a potential for inconsistent or contradictory judgments, the prospect of a race for the courthouse, and an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the expense and delay to all parties and the court system in resolving the legal and factual issues common to all Class members' claims relating to Defendant's unlawful conduct. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

88.     The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

89.     The prosecution of separate actions by numerous individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for Defendant;

90.     The prosecution of separate actions by individual Class members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interest of other Class members who are not a party to such adjudications and would substantially impair or impede the ability of such non-party Class members to protect their interests; and

91.     Defendants have acted on grounds generally applicable to the entirety of the Class, thereby making appropriate final declaratory and injunctive  relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I – MONOPOLIZATION
### Violation of the Sherman Act, 15 U.S.C. § 2

92.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

93.     As described above, from at least as early as January 1, 2006 until the present, Defendant possessed monopoly power in the market for B2B Credit Scores. No other competitor has been able to restrain Defendant's ability to charge supracompetitive monopoly prices for its credit scores during the relevant time period. Fair Isaac had and has the ability to control prices and exclude competitors.

24

94.    Fair Isaac willfully and unlawfully maintained its market power in the B2B Credit Score market by engaging in an anticompetitive scheme to prevent legitimate competition on the merits. Fair Isaac's monopoly have been maintained by its anticompetitive conduct and not as a result of providing a superior product, business acumen, or historical accident.

95.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

96.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

97.    Fair Isaac's course of anticompetitive conduct include anticompetitive agreements with credit bureaus, requiring those entities to exclusively or nearly exclusively exclude competitors like VantageScore and maintain its monopoly. Collectively, Fair Isaac's contracts with credit bureaus substantially foreclose the B2B Credit Score market from actual and potential competition.

98.    There are no valid procompetitive justifications for Defendant's exclusionary conduct in the B2B Credit Score market and even if there were (and there are not), any such procompetitive benefit could have been obtained through less restrictive means.

99.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

100.    Plaintiff and members of the Class have been injured in their property by Defendant's antitrust violations. Their injury consists of having paid, and continuing to pay, higher prices for B2B Credit Scores than they would have paid absent Defendant's scheme. Such

25

injury is of the type antitrust laws were designed to prevent and flows from that which makes Defendant's conduct unlawful. Plaintiffs are the proper entities to bring a private case concerning this conduct.

101.    Fair Isaac's monopolization has injured and will continue to injure competition in this market. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

102.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT II – CONSPIRACY TO MONOPOLIZE
### Violation of the Sherman Act, 15 U.S.C. § 2

103.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

104.    Fair Isaac entered into a combination or conspiracy with the credit bureaus to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with each of the credit bureaus. In these agreements, the credit bureaus and Fair Isaac agreed that the credit bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the credit bureaus (the top three being TransUnion, Experian, and Equifax) further agreed that they would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

26

105.     These agreements foreclosed competition in a substantial portion of the B2B Credit Score market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

106.     Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

107.     Fair Isaac's monopolization conspiracy has injured and will continue to injure competition in this market.

108.     Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

109.     Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

110.     The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

111.     Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

112.     Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

### COUNT III – UNREASONABLE RESTRAINT OF TRADE
### Violation of the Sherman Act, 15 U.S.C. § 1

113.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

27

114.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2006, and continuing through the present, the exact dates being unknown to Plaintiff, Defendant and its co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, and stabilize prices in the B2B Credit Score Market in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

115.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendant and its co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: entering into agreements with credit bureaus TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each credit bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

116.    The combination and conspiracy alleged herein has had the following effects, among others: (1) price competition in the sale of B2B Credit Scores has been restrained, suppressed, and/or eliminated in the United States; (2) prices for B2B Credit Scores sold by Defendant and credit bureaus have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and (3) those who purchased B2B Credit Scores from Defendant and credit bureaus have been deprived of the benefits of free and open competition.

117.    The agreements between Fair Isaac and the credit bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

118.    The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

119.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

120.    Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

121.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

122.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

**COUNT IV – VIOLATIONS OF STATE ANTITRUST LAWS**

123.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

124.    By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

    a.   Arizona Revised Statutes § 44-1401, *et seq*.;

b. California Cartwright Act, California Business & Professions Code § 16700, *et seq.*;

c. Connecticut Antitrust Act, Conn. Gen. Stat. 35-24, *et seq.*;

d. District of Columbia Code § 28-4501, *et seq.*;

e. Hawaii Revised Statutes § 480-2, *et seq.*;

f. Illinois Antitrust Act, Illinois Complied Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*;

g. Iowa Competition Law, Iowa Code § 553.1, *et seq.*;

h. Kansas Statutes Annotated § 50-101, *et seq.*;

i. Maine Revised Statutes Annotated, tit. 10, § 1101, *et seq.*;

j. Maryland Code Annotated, Commercial Law, § 11-204, *et seq.*;

k. Michigan Compiled Laws § 445.771, et seq.;

l. Minnesota Antitrust Law of 1971, Minnesota Statutes § 325D.49, *et seq.*;

m. Mississippi Code Annotated § 75-21-1, *et seq.*;

n. Nebraska Revised Statutes § 59-801, *et seq.*;

o. Nevada Revised Statutes Annotated § 598A.010, *et seq.*;

p. New Mexico Statutes Annotated § 57-1-1, *et seq.*;

q. New York Donnelly Act, New York General Business Law § 340, *et seq.*;

r. North Carolina General Statutes § 75-1, *et seq.*;

s. North Dakota Century Code § 51-08.1-01, *et seq.*;

t. Oregon Revised Statutes § 646.705, *et seq.*;

u. Rhode Island General Laws § 6-36-4, *et seq.*;

v. South Dakota Codified Laws § 37-1-3.1, *et seq.*;

w.  Tennessee Code Annotated § 47-25-101, *et seq.*;

x.  Utah Code Annotated § 76-10-3104, *et seq.*;

y.  Vermont Statutes Annotated, tit. 9, § 2451, *et seq.*;

z.  West Virginia Code § 47-18-1, *et seq.*; and

aa. Wisconsin Statutes § 133.01, *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays that:

1.  The Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring Plaintiff as the representative of the Class and its counsel as counsel for the Class;

2.  The Court declare the conduct alleged herein to be unlawful in violation of the laws as set forth above;

3.  Plaintiff and each member of the Class recover punitive and treble damages to the extent such are provided by the law;

4.  Defendant be enjoined from continuing the illegal activities alleged herein;

5.  Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

6.  Pre- and post-judgment interest, to the extent allowable; and

7.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a trial by jury as to all issues so triable.

Dated: May 1, 2020

Respectfully submitted,

*/s/ Kenneth A. Wexler*
Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Dennis Stewart
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3200
dstewart@gustafsongluek.com

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua J. Rissman
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612)
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Garrett D. Blanchfield
Brant D. Penney
**REINHARDT, WENDORF & BLANCHFIELD**
332 Minnesota Street. Suite W-1050
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

*Counsel for Plaintiff and the Proposed Class*